Carolyn H. MAFRIGE, Plaintiff,

v.

UNITED STATES of America and Louis Dreyfus Natural Gas Corp., Defendants.

Civ.A. No. L–91–95.

United States District Court, S.D. Texas, Laredo Division.

July 6, 1995.

Richard Morales, Jr., Person, Whitworth, Ramos, Borchers & Mor, Laredo, TX, for plaintiff.

Charles Wendlandt, Asst. U.S. Atty., Corpus Christi, TX, for defendant U.S.

William B. Burford, Hinkle, Cox, Eaton, Coffield & Hensley, Midland, TX, Ricardo Daniel Palacios, Laredo, for defendant Louis Dreyfus Natural Gas Corp.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

This quiet title action involves a dispute over the ownership interests of Carolyn H. Mafrige, the United States of America, and Louis Dreyfus Natural Gas Corp. in the mineral rights to land deeded by Mafrige to the United States. Pending are the United States' motions to dismiss Mafrige's complaint and to dismiss Louis Dreyfus' cross-complaint. Also pending are Mafrige's motions for partial summary judgment and for payment of royalties into the Court's registry.

**694**

### Background

In February of 1978, the U.S. Department of the Interior (DOI) determined it required land owned by Carolyn H. Mafrige and her mother, Edna Gibbens Henry, for its "Nueces River Project" in McMullen County, Texas. The United States Government then negotiated with Mafrige and Henry for the sale of 365.41 acres of their property in McMullen County. The parties signed the land purchase contract on May 23, 1979. The contract called for sale to the United States subject to interests reserved to the vendors. It states in part:

> This contract, and subsequent conveyance, is made subject to the following reservations:
>
> (1) All of the Vendor's non-participating royalty interest in and to oil, gas, and other mineral interest in and under the property described in;
>
> (2) The Right of Vendor, herein, to receive royalty and/or rent payments from all existing oil, gas, and other mineral leases until such leases expire by their own terms.

U.S. Department of the Interior; Bureau of Reclamation, Contract No. 9–07–5B–L0642. Although the Government concedes it drafted the contract, it maintains Mafrige was represented throughout the negotiations by her husband, Stevens Mafrige, an attorney licensed by the State Bar of Texas.

In a June 7, 1979 letter to Henry, Ronald W. Mills, Acting Project Construction Engineer for the Bureau of Reclamation (BOR), confirmed that the purchase contract contemplated the vendors' reserving their royalty interests. "The contract clearly indicates that you, along with your daughter, reserved all your nonparticipating royalty interest. This insures your right to derive all benefits from this nonparticipating royalty interest. The United States is obtaining no interest in this nonparticipating royalty." Ex. I, Plf. Mafrige's Mot. for Partial Summ. J., Apr. 28, 1993. The Bureau of Reclamation reconfirmed this arrangement in a July 2, 1979 letter to Henry from Project Construction Engineer Allen C. Gates. That letter states the following:

> *In the Land Purchase Contract between you and the United States, and the subsequent Warranty Deed to the United States, you are retaining all your nonparticipating royalty interest in the property conveyed to the Government.* It is the policy of this agency, as well as the United States, to lease property for oil and gas exploration and development. It is also a policy of the United States that, when a lease is negotiated, it will be for no less consideration (bonuses, delay rentals, and royalties) than the consideration of other similar leases on adjoining property. With this in mind, when the Government would negotiate a lease for the property you are conveying to the United States, the royalty would be no less than similar leases on the adjacent and adjoining property not owned by the Government

Ex. J, Plf. Mafrige's Mot. for Partial Summ. J., Apr. 28, 1993 (emphasis added).

The warranty deed, drafted by the Government and executed on July 4, 1979, differed from the purchase contract in one significant respect. Instead of stating that the conveyance was "subject to the following reservations," it merely stated:

> This conveyance is subject to the following:
>
> .　　.　　.　　.　　.
>
> (2) Outstanding oil, gas, and other mineral interests, including leases, outstanding in the public or third parties.
>
> (3) All of the Grantors' non-participating royalty interest in and to oil, gas and other mineral interests in and under the property described herein.
>
> (4) The right of Grantors, herein, to receive royalty and/or rent payments from all existing oil, gas, and other mineral leases until such leases expire by their own terms.
>
> (5) *RESERVING*, to the Grantors, their heirs and assigns the non-exclusive right of ingress and egress ... for domestic, and livestock uses....

Vol. 167, pg. 52 of Deed Records of McMullen County, Texas.

At the time of the conveyance, no leases burdened the mineral fee. The only outstanding interest in the property was a ½₂

nonparticipating term royalty interest (NPTRI), reserved by Mary, Adele, and Brookes Henderson in a warranty deed to Carl Poenisch dated October 10, 1941, in "all oil gas and other minerals produced for a term of fifty years from January 25, 1946 and so long thereafter as there is production."

Mafrige contends that, at the time of the conveyance, the parties intended the deed to convey only the surface estate and the executive interest in the mineral estate—*i.e.*, the right to lease the mineral fee and the right to receive all bonuses and delay rentals. If the Government were to lease the mineral estate in the future, Mafrige would receive all royalty payments—except those due on outstanding mineral or royalty interests.

The BOR shared this view at least as late as February 23, 1989, when it responded to the Bureau of Land Management's (BLM) inquiry regarding the United States' interest in the mineral fee under the land deeded by Henry and Mafrige. "[O]ur records indicate that a commitment can be made regarding a stipulation of interests whereby the United States owns the fee surface and the executory mineral rights with the nonparticipating royalty owners receiving all of the leasehold royalty. All of the royalty (⅛) belongs to the XKY owners and applicants."

As the BOR memorandum suggests, the Government and Mafrige did not dispute their respective rights in the mineral fee under the acreage for over ten years after the execution of the deed. Then on September 6, 1988, pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.*, and the Mineral Leasing Act for Acquired Lands of 1947, 30 U.S.C. §§ 351 *et seq.*, the BLM leased the oil, gas, and other minerals under 273.91 acres of this land to the Royal Oil & Gas Co. (Lease No. TX NM 77169).[1]

The standardized DOI lease form, which incorporates the provisions of the Mineral Leasing Acts, granted the lessee "the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium)" in the subject lands. In return, Section One of the lease sets the annual rental fee at $1.50 per acre during the first five years of the lease. The rate would then rise to $2.00 per acre per annum for the duration of the lease. Section Two directs the lessee to pay a twelve and one-half percent (⅛th) royalty interest. The rentals and royalties were to be paid "to the proper office of the lessor." The lease does not indicate whether the ⅛th royalty was to be reduced by the ⅛₂ NPTRI reserved by the Hendersons in 1941, or whether the lessee must pay the Hendersons out of its own share. Nor does the lease mention any interest purportedly reserved by Mafrige.

Mafrige found the lease to Royal unacceptable. Her husband wrote a letter to the BLM on April 14, 1989 complaining of the ⅛th royalty. Because other lessors in the vicinity had obtained royalties as high as ³⁄₁₆ths and ¼th, Mafrige urged the BLM to resubmit the lease for bids. The BLM refused to do so. The Mafriges then retained counsel to pursue a claim under the Federal Tort Claims Act for breach of the duty of utmost good faith. A June 19, 1990 letter from Mafrige's attorney to the BLM demanded the Government pay Mafrige $681,563.87 in "lost royalties." The Mafriges amended their demand to $1,899,129.82 in another letter to the BLM dated July 18, 1990.

In the meantime, Royal commenced exploration, drilling two producing wells by the fall of 1989. Royal paid the ⅛th royalty, reduced by the Hendersons' ⅛₂nd NPTRI, to Mafrige,[2] even though the lease directed the payments to be made to the Government. The Government did not contest these payments for almost a year. Then, on February 14, 1990, the Field Solicitor's office of the DOI sent a memorandum to the BLM rejecting the view taken by the BOR. It stated that the DOI now believed the United States was entitled to a royalty of one-eighth of all oil and gas produced from the leased lands

---

**1.** The Government unilaterally amended this lease on December 1, 1988. The amended lease corrected errors in the description of the lands lease. This error does not bear on the present lawsuit.

**2.** By the time the lease was executed, Henry had died, leaving her interest in the property to Mafrige.

and that Mafrige was entitled to nothing. The Government also maintained the Hendersons' interest should not be deducted from its royalty interest, but rather should be taken from the lessee's ⅞th share.

Royal Oil & Gas Co. subsequently assigned the lease, with the necessary approval of the Secretary of the Interior, to DeKalb Energy Texas, Inc. on August 1, 1990. Upon assignment, DeKalb continued paying Mafrige royalty payments under the lease. Soon thereafter, however, the Government reasserted the position taken in the February 14, 1990 memorandum. The Mineral Management Service of the Department of the Interior (MMS) verbally notified DeKalb that it claimed the right to a ⅛th royalty interest free and clear of the ½₂nd nonparticipating term royalty interest reserved by the Hendersons in 1946. The Government reiterated this position once again when the MMS sent a letter to DeKalb inquiring whether any funds were being held in an escrow account on behalf of the United States.

DeKalb brought suit against the United States in this Court on September 25, 1991 under the Quiet Title Act, 28 U.S.C. §§ 1346(f) and 2409(a). DeKalb seeks to quiet title in its favor in a "⅞ leasehold" (the right to ⅞ths of production) created by the September 6, 1988 lease and the August 1, 1990 assignment. The Government counterclaimed, alleging DeKalb had refused to pay the United States the ⅛th royalty it owned. It demanded DeKalb account for ⅛th of production from the lease and pay damages for the amounts due.

DeKalb then joined Mafrige as a defendant and informed her that it was suspending all royalty payments to her pending the outcome of the litigation. Mafrige answered that the United States owned no interest in the mineral fee other than the executive interest and that she was entitled to all royalties from the Royal/DeKalb lease. She also cross-claimed

against the United States under four theories: (1) "concealment, continuing conduct, and reformation"; (2) quiet title; (3) negligence; (4) and breach of fiduciary duty or duty of utmost good faith.

On August 11, 1992, the Court realigned the parties so that Mrs. Mafrige became the plaintiff, DeKalb became a defendant, and the United States remained a defendant. Mrs. Mafrige's first amended cross-claim against the United States became her complaint, and DeKalb's first amended complaint became its cross-claim. The United States' counterclaim against DeKalb became its cross-claim. On March 9, 1993, the Court granted an unopposed motion substituting Louis Dreyfus Natural Gas Corp. for DeKalb as a defendant.

### Discussion

#### I. United States' Motion to Dismiss Louis Dreyfus Natural Gas Corp.'s Cross-complaint.

The United States moves to dismiss Dreyfus' cross-claim to quiet title to a ⅞th mineral leasehold in the subject lands on two grounds. The Government first argues the cross-claim must be dismissed under Fed. R.Civ.P. 12(b)(6) because it does not state a claim for relief under the Quiet Title Act, 28 U.S.C. § 2409a.[3] Alternatively, the Government maintains the cross-claim must be dismissed as premature because Dreyfus or its predecessor in interest never afforded the DOI an opportunity to formally construe the lease and make a decision as to the amount of royalty due the Government.

#### A. Failure to State a Claim Under Fed. R.Civ.P. 12(b)(6).

■ The Government contends Dreyfus' claim is not cognizable under the Quiet Title Act, 28 U.S.C. § 2409a. Section 2409a(a) states that "[t]he United States may be named as a party defendant in a civil action

---

3. This motion arguably should have been brought under Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction over the subject matter) instead of under Fed.R.Civ.P. 12(b)(6) (failure to state a claim). As a sovereign, the United States cannot be sued unless Congress expressly waives its immunity. The Quiet Title Act permits the United

States to be named as a party defendant in suits to adjudicate disputes to real property in which the United States claims an interest. Here the Government argues that, because the suit falls outside the scope of the Act, this Court lacks subject matter jurisdiction over the claim.

under this section to adjudicate a disputed title to real property in which the United States claims an interest. . . ." "Disputed title" under this section means disputed ownership. *Landow v. Carmen,* 555 F.Supp. 195, 196 (D.Md.1983).

The Government seizes upon the language "disputed title to real property" to challenge the validity of Dreyfus' claim. It argues a federal oil and gas lease does not convey an ownership interest in real property. The lease merely gives the lessee a contractual right to explore for and develop the mineral rights. Therefore, Dreyfus acquired no ownership interest in real property. Because Dreyfus can claim no property interest, there can be no "disputed title to real property." The only dispute at issue here, the Government concludes, involves the construction of the terms of a lease—which is not cognizable under the Quiet Title Act.

This Court must determine whether a federal oil and gas lease issued under the Mineral Leasing Act for Acquired Lands of 1947 conveys an ownership interest in real property for purposes of § 2409a(a). Federal law controls. *E.g., Vincent Murphy Chevrolet Co., Inc. v. United States,* 766 F.2d 449, 451 (10th Cir.1985) (stating the interpretation of the Quiet Title Act is a matter of federal law); *Fulcher v. United States,* 696 F.2d 1073, 1076 (4th Cir.1982) (same). The question may be divided into two parts: (1) whether oil, gas, and other mineral deposits constitute real property under § 2409a(a), and if so, (2) whether a federal mineral lease conveys an ownership interest in those minerals.

■ The first issue is easily resolved. Courts have heard cases under § 2409a(a) where only mineral interests are in dispute. *E.g., Amoco Production Co. v. United States,* 663 F.Supp. 998, 999 (D.Utah 1987); *K.N. Energy v. Marathon Oil Co.,* 1983 WL 1430 (D.Neb.1983). The legislative history to the Quiet Title Act indicates Congress intended for the Act to create jurisdiction for disputes involving only the title to minerals. "The quieting of title where the plaintiff claims an estate less than a fee simple—an easement or *the title to minerals*—is likewise included in the terms of the proposed statute."

H.R.Rep. No. 92–1559, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.S.C.A.N. 4552, 4554 (emphasis added). Mineral deposits therefore fall within § 2409a(a)'s definition of real property.

Whether a federal lease conveys title or ownership in those minerals for purposes of § 2409a(a) is a more difficult issue. In the absence of federal precedent, this Court may consult state property law if that law is not hostile to federal interests. *See, e.g., Reconstruction Fin. Corp. v. Beaver County,* 328 U.S. 204, 208–09, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946) (using state law to define "real property" under § 10 of the Reconstruction Finance Corp. Act since "the state rules do not effect a discrimination against the government, or patently run counter to the terms of the Act"). Indeed, courts have repeatedly used state law in developing standards under the Quiet Title Act. *See Vincent Murphy Chevrolet Co., Inc.,* 766 F.2d at 451 (stating that state law may be invoked in the application of language of the QTA to specific facts); *Fulcher,* 696 F.2d at 1076 (same); *K.N. Energy,* 1983 WL 1430 (using Nebraska law to determine whether natural gas that had escaped from an underground reservoir was "real property" under QTA). Accordingly, the Court turns to Texas law.

Texas courts have long held that oil and gas leases convey interests in real property. *E.g., REO Industries v. Natural Gas Pipeline Co.,* 932 F.2d 447 (5th Cir.1991). The Texas Supreme Court recognized in 1917 that oil and gas deposits "lie within the strata of the earth, and necessarily are a part of the realty. Being a part of the realty while in place, it would seem to logically follow that, whenever they are conveyed while in that condition or possessing that status, a conveyance of an interest in realty results." *Texas Co. v. Daugherty,* 107 Tex. 226, 176 S.W. 717, 719 (1915).

The *Daugherty* court concluded that an oil and gas lease invests the lessee and his assigns with title to the oil and gas deposits. *Id.* 176 S.W. at 718–19. The court elaborated on the nature of this interest several years later in *Stephens County v. Mid–Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290 (1923). It stated that oil and gas leases create deter-

minable fees, "leaving in the grantors, their heirs or assigns, the possibility of reacquiring the absolute fee-simple titles, less whatever minerals may be meantime produced and marketed." *Id.* 254 S.W. at 295.

The Government argues that *Daugherty* and its progeny cannot be used to develop the federal standard here because they conflict with federal case law interpreting the Mineral Leasing Act. It directs the Court's attention to *Boesche v. Udall,* 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963). The Supreme Court held in *Boesche* that the Secretary of the Interior maintains significant control over federal oil and gas lessees, including the right to cancel a lease issued by his Department in violation of the Mineral Leasing Act. 373 U.S. at 476–79, 83 S.Ct. at 1376–77. The Government points to language in *Boesche* that the lease "does not give the lessee anything approaching the full ownership of a fee patentee" or "an unencumbered estate in the minerals," *Id.* at 478–79, 83 S.Ct. at 1377.

This language does not mean that a federal oil and gas lease vests no property interest in the lessee. On the contrary, in framing the issue in *Boesche,* the Court referred to a federal oil and gas lease as a conveyance. "We think that no matter how *the interest conveyed* is denominated the true line of demarcation is whether as a result of the transaction 'all authority or control' over the lands has passed from 'the Executive Department'. . . ." *Id.* (citations omitted) (emphasis added). As the Ninth Circuit noted in *Union Oil Co. v. Morton,* 512 F.2d 743 (9th Cir. 1975), applying *Boesche* to Outer Continental Shelf Lands Act leases, the "lease does con-

vey a property interest enforceable against the Government, of course, but it is one lacking many of the attributes of private property." *Id.* at 747.[4]

■ That a lease conveys only a "property interest" in the minerals, and not complete ownership, is inconsequential under § 2409a(a). A party need only claim some ownership interest in the property to create a "disputed title to real property." *See Werner v. United States,* 9 F.3d 1514, 1516 (11th Cir.1993) (QTA action in which plaintiff claimed only an easement by necessity); *Shultz v. Department of Army,* 886 F.2d 1157, 1159 (9th Cir.1989) (QTA action in which plaintiff claimed only a right-of-access over U.S. military installation). Consequently, the Court holds that an oil and gas lease under the Mineral Leasing Act for Acquired Lands creates an interest in real property for the purposes of the Quiet Title Act. The Government's first ground for dismissing Dreyfus' claim fails.

### B. *Failure to File Administrative Claim.*

■ The Government also argues Dreyfus' action should be dismissed because the oil company failed to exhaust, or even resort to, available administrative remedies before seeking relief in this Court. Regulations implementing the Mineral Leasing Act of 1920 and the Mineral Leasing Act for Acquired Lands of 1947 provide a detailed process for dealing with various types of complaints by federal lessees. The Government points specifically to 43 C.F.R. § 3165.1–1, which states that petitions for the modification of royalty or rental requirements must

---

**4.** Lessees under Texas leases are likewise subject to an array of restrictions and conditions imposed by protective lease clauses and implied covenants. All oil and gas leases in Texas include habendum and delay rental clauses. The habendum clause divides the lease into a primary and a secondary term. The primary term sets a fixed time period during which the lessee will normally have no obligation to conduct drilling operations and secure production on the property. The lease will extend into the secondary term only if production is obtained and sustained in paying quantities. The habendum clause is said to create the fee simple determinable.

The delay rental clause authorizes the lessee to delay the drilling of an initial well by periodically

paying a stipulated sum of money to the lessor during the primary term. But payments under this clause cannot extend the lease into the secondary term. Under the type of delay rental clause most commonly found in Texas leases, failure to pay rentals on time automatically terminate the lease.

Moreover, Texas law implies several covenants in every oil and gas lease: the covenant to protect against drainage, the covenant to market, the covenant for reasonable development. Breach of an implied covenant often results in a conditional cancellation decree. Failure to correct the breach results in cancellation.

be filed with the Minerals Management Service. It also cites 30 C.F.R. part 290 for the right to appeal the decision of the MMS officer hearing the case to the Director of the MMS, and 43 C.F.R. part four for the right of further appeal to the Interior Board of Land Appeals. Only after the exhaustion of administrative appeals may claims within the jurisdiction of the MMS or the DOI be brought into U.S. District Court through the Administrative Procedures Act. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 49–52, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938); *Hodges v. Callaway*, 499 F.2d 417, 423 (5th Cir.1974).

The Government contends a federal oil and gas lessee disagreeing with the Minerals Management Service's interpretation of its rights under the lease must avail itself of this administrative procedure. It relies on a series of cases, all of which are inapposite. *See Mesa Operating Ltd. v. Dept. of the Interior*, 931 F.2d 318 (5th Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 934, 117 L.Ed.2d 106 (1992); *Hoover & Bracken Energies, Inc. v. United States Dept. of the Interior*, 723 F.2d 1488 (10th Cir.1983), *cert. denied*, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). The issue in these cases was how to calculate the value of the minerals produced under the lease, which in turn affected the amount of royalties paid.

■ The instant case is different. It involves a dispute regarding ownership interests in a mineral estate. Dreyfus claims it owns a full ⅞th leasehold while the Government maintains Dreyfus' owns a ⅞th leasehold reduced by the term royalty interest reserved by the Henderson family in 1946. In short, this case is a quiet title action, and the Quiet Title Act represents the exclusive means of challenging United States titles. *Block v. North Dakota*, 461 U.S. 273, 283–86, 103 S.Ct. 1811, 1818–19, 75 L.Ed.2d 840 (1983). Administrative appeals and judicial appeals under the Administrative Procedures Act are not available where the Quiet Title

Act applies. *McIntyre v. United States*, 789 F.2d 1408, 1410 (9th Cir.1986). Because this Court possesses subject matter jurisdiction over this action, the Government's motion to dismiss under Fed.R.Civ.P. 12(b)(1) is **DENIED**.

## II. United States' Motion to Dismiss Mafrige's Amended Complaint.

Mafrige's amended complaint includes four claims: (1) "concealment, continuing conduct, and reformation"; (2) quiet title; (3) negligence; and (4) breach of fiduciary duty/duty of utmost good faith. The Government moves to dismiss each on separate grounds.

### A. Reformation of Deed.

The Government interprets Mafrige's cause of action for "concealment, continuing conduct and reformation" as two separate claims: one for concealment and continuing conduct and another for reformation of the deed based upon mutual mistake. The Court interprets the pleadings only to state a claim for reformation of the deed based upon mutual mistake. Mafrige appears to have referred to concealment and continuing conduct only to suggest that she could not have known of the Government's claim at the time of the execution of the deed, thereby anticipating a statute of limitations defense.[5]

■ The Government contends that the Quiet Title Act does not provide this Court with subject-matter jurisdiction to reform a deed.[6] Mafrige responds that she does not seek to reform the deed under this Act. *See* Carolyn H. Mafrige's Resp. to the Court's November 15, 1994 Order, pp. 3 (stating "[t]he First Amended Cross-claim clearly and unequivocally reveals that Mafrige does not seek to reform the subject 1979 Warranty Deed pursuant to the Quiet Title Act"). Rather, she seeks reformation based upon mutual mistake as a state-law claim under the Court's supplemental jurisdiction. 28 U.S.C. § 1367.

---

5. A claim for "concealment and continuing conduct" would likely be barred by the misrepresentation and deceit exceptions to the FTCA's waiver of sovereign immunity. 28 U.S.C. § 2680(h).

6. The Fifth Circuit identified this issue in *Hart v. United States*, 585 F.2d 1280, 1283 (5th Cir. 1978), but declined to resolve it because the plaintiffs' claims in that case were barred by the Quiet Title Act's 12–year statute of limitations.

Mafrige's argument ignores the critical fact that the United States of America is a sovereign. Absent an express waiver by statute, it is immune from suit. *F.D.I.C. v. Meyer*, —— U.S. ——, ——, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). Supplemental jurisdiction generally allows a federal court with jurisdiction over a claim to hear a pendent state claim which it could not otherwise hear, but the doctrine presupposes that a valid state claim exists. There can be no valid state claim against the federal sovereign unless it has expressly consented to such a claim. There is no indication of consent here. This Court lacks subject-matter jurisdiction over Mafrige's reformation claim, and the Government motion to dismiss that claim is **GRANTED.** Mafrige's motion for partial summary judgment on her reformation claim is **DENIED** as moot.

### B. *Quiet Title Action.*

The Government moves to dismiss Mafrige's claim to quiet title as time-barred under the twelve-year statute of limitations in 28 U.S.C. 2409a(g). Because the statute of limitations defense is jurisdictional in suits against the United States, *Block,* 461 U.S. at 279, 103 S.Ct. at 1815; *Shultz v. Department of the Army,* 10 F.3d 649, 662 (9th Cir.1993), the Court construes the motion as one brought under Fed.R.Civ.P. 12(b)(1). *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 766 (4th Cir.1991) (affirming district court's dismissal of plaintiff's Quiet Title action under Fed. R.Civ.P. 12(b)(1) for failure to bring the action within the twelve-year limitations period), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992).

In ruling on a Rule 12(b)(1) motion where, as here, the defendant attacks the factual basis for jurisdiction, the Court may hear evidence regarding jurisdiction and to rule on that issue prior to trial. *Williamson v. Tucker,* 645 F.2d 404, 412–14 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Augustine v. United States,* 704 F.2d 1074, 1076 (9th Cir.1983); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 892 (3d Cir.1977). "No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill Publishing Co. v. General Tel. Corp.,* 594 F.2d 730, 733 (9th Cir.1979).

A suit under the Quiet Title Act is barred unless it is commenced within twelve years of the date upon which it accrues. 28 U.S.C. 2409a(g). "Such an action shall be deemed to have accrued on the date that the plaintiff or his predecessor knew or should have known of the claim of the United States." 28 U.S.C. § 2409(f). The test is one of reasonableness. "All that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiffs." *Knapp v. United States,* 636 F.2d 279, 283 (10th Cir.1980).

The Government insists that Mafrige should have known of the Government's claim to a royalty interest on July 4, 1979, the date of the execution of the deed, because the language of the deed itself makes clear that Mafrige did not reserve a royalty interest. Although the construction of a deed to which the United States is a party is a question of federal law, Texas law may be adopted as the federal standard where that law is not contrary to federal interests. *See United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 594–95, 93 S.Ct. 2389, 2398, 37 L.Ed.2d 187 (1973); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–68, 63 S.Ct. 573, 574–76, 87 L.Ed. 838 (1943). Here the parties seem to agree that Texas rules of contract interpretation furnish the appropriate standard.

Unlike the land purchase contract, which made the conveyance "subject to the following reservations ...," the deed stated only that the conveyance was "subject to the following: ... (3) all of the grantors' nonparticipating royalty interest...." The Government claims that this language is not an express reservation of a royalty interest to the grantors but was only a limitation on their warranty. *Ladd v. Du Bose,* 344 S.W.2d 476, 479 (Tex.Civ.App.—Amarillo 1961, no writ).

As further proof that the deed does not reserve a royalty interest, the Government points to clause five of the "subject to" paragraph. "This conveyance is subject to the following: ... ' (5) *RESERVING* to the grantors, their heirs and assigns the nonexclusive right of ingress and egress ... for domestic, and livestock uses...." Had the parties intended the grantors to reserve a royalty interest in clause three, the argument goes, they would have stated so explicitly, just as they did with the rights of ingress and egress in clause five.

The Government's argument is unpersuasive. Texas courts have held that "subject to" is a term of qualification, meaning "subordinate to," "subservient to," or "limited by." *Kokernot v. Caldwell,* 231 S.W.2d 528, 531 (Tex.Civ.App.—Dallas 1950, writ ref'd n.r.e.). It can limit the estate granted, the estate warranted, or both, depending on the intent of the parties. *Bass v. Harper,* 441 S.W.2d 825, 827 (Tex.1969). In *Bass,* the Court rejected the defendant's argument that the relevant "subject to" provision referred only to the warranty, reasoning that "[t]he instrument in question [did] not relate the outstanding mineral royalty interests to the warranty. It could have done so, but it is tied specifically to the grant. The Grant, not the Warranty, is made subject to outstanding interests." *Id.* The same holds true here, as the warranty provision is found in a separate section of the deed. With respect to the clause reserving the right ingress and egress, it is taken verbatim from the purchase contract, which also contained language expressly reserving the vendors' non-participating royalty interest.

Moreover, other evidence demonstrates that the parties intended for the conveyance to reserve to Mafrige and Henry all royalties from future leases. First, the land purchase contract, which expressly reserves a royalty interest to Mafrige, anticipates the execution of a deed with an identical reservation. Second, the letters that the BOR sent Henry in the months leading up to the execution of the deed confirm that the conveyance to the United States would not include any royalty interest. *See* p. 694 *supra.*

Finally, the Government acknowledged Mafrige's royalty interest for years after the execution of the deed. In response to the BLM's inquiry on the United States' interests under the September 1988 lease, the BOR stated that "[t]he United States should receive payment for only the lease bonus and any delay rentals. All of the royalty (⅛) belongs to the NPRI owners and applicants. The United States does not own any royalty interest and thereby is not entitled to receive any royalty payments." While the BLM ultimately rejected Reclamation's position, it did not initially challenge the royalty payments made to Mafrige. Royal drilled two producing wells in the fall of 1989 and began making royalty payments to Mafrige. Yet, the MMS did not demand royalties for the United States until 1991. DeKalb did not discontinue making its royalty payments to Mafrige until early 1992, when Mafrige claims she first learned of the United States' claim to royalties.

While the ultimate meaning of the 1979 deed must yet be determined, Mafrige did not have constructive notice of the Government's adverse position for several years after the execution of the deed. She filed this quiet title action well within the twelve-year limitations period.

■ The Government proffers a second ground for dismissing Mafrige's claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. It argues that the deed could not have reserved a royalty interest on Mafrige's behalf because the Mineral Leasing Act for Acquired Lands mandates that all royalties from oil and gas produced on acquired lands be paid into the U.S. Treasury. It notes that the "laws in force at the time and place of the making of a contract, and which affect its validity, performance, and enforcement, enter into and form part of it, as if they were expressly referred to or incorporated in its terms." *Northern Pacific Ry. Co. v. Wall,* 241 U.S. 87, 90–91, 36 S.Ct. 493, 495, 60 L.Ed. 905 (1916). "Therefore, the true agreement of the parties must be deemed to have included a stipulation that all of the royalties derived from future leases would be paid into the United States Treasury, 30 U.S.C. § 191, 355, and that any future leases

would provide for the payment of a royalty of at least 12.5 percent to the United States. *See* 30 U.S.C. § 226; 43 C.F.R. § 1810.3." United States' Resp. to Carolyn Mafrige's Mot. for Partial Summ.J., Apr. 28, 1993, p. 1.

The Government's position fails to consider another provision of the Act, 30 U.S.C. § 354. That section states that "[w]here the United States does not own all of the mineral deposits under any lands sought to be leased and which are affected by this chapter, the Secretary is authorized to lease the interest of the United States in any such mineral deposits...." This provision implies that the Government does not always own all of the minerals under the lands it may lease. It follows as a matter of common sense that the Government has no right to collect and keep royalties on minerals it does not own. Sections 191, 355, and 226 are not inconsistent with Mafrige's claim that she reserved a nonparticipating royalty interest. The Government's motion to dismiss Mafrige's quiet title claim is **DENIED.**

### C. *Negligence Claims.*

■ Mafrige's amended complaint outlines two causes of action for negligence under the Federal Tort Claims Act (FTCA). First, she claims that the Government did not exercise reasonable care in preparing the deed. This resulted in the execution of a deed that failed to expressly reserve to the grantors the right to all royalties from future leases. Second, Mafrige alleges that the Government, as holder of the executive interest, breached its duty to the nonparticipating royalty interest holders to lease the minerals for the highest royalty possible. *See* Def./Cross-claimant Carolyn H. Mafrige's First Am.Answer and Cross-cl., July 9, 1992, pp. 15–16. Under the FTCA, the Government is liable "in the same manner and to the same extent as a private person under like circumstances." 28 U.S.C. § 2674. In making this determination, the Court must look to "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Mafrige concedes that the purchaser in an arms-length real estate transaction is not normally under an obligation to use reasonable care in safeguarding the interests of the seller, but contends that the Government assumed such a duty in this case by drafting the July 4, 1979 deed. She refers to the "Good Samaritan" doctrine, which provides that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 119 (Tex.1976).

■ Courts emphasize that the doctrine applies only when the party undertaking the voluntary course of action does so for the benefit of the other party. *Philadelphia Mfrs. Mut. Ins. Co. v. Gulf Forge Co.,* 555 F.Supp. 519, 526 (S.D.Tex.1982); *Colonial Sav. Ass'n,* 544 S.W.2d at 119; *Peterson v. Mutual Sav. Inst.,* 646 S.W.2d 327, 329 (Tex. App.—Austin 1983, no writ). The Government drafted the deed to consummate the purchase of Mafrige's land. Any incidental benefits that Mafrige might have derived from this do not satisfy the requirement that the Government's action be for Mafrige's benefit. *Philadelphia Mfrs.,* 555 F.Supp. at 526. Imposing a duty on the Government under these circumstances would be an unwarranted and imprudent extension of the "Good Samaritan" doctrine. Because Mafrige points to no credible authority that Texas law would impose liability on a private party under similar circumstances, the Government's motion to dismiss Mafrige's claim for negligent drafting of the July 4, 1979 deed is **GRANTED.**

■ Mafrige's claim for negligent leasing also lacks merit. Under Texas law, an executive interest holder's failure to obtain for his royalty interest owners the highest royalty possible does not sound in simple negligence. It is considered, depending on the circumstances, a breach of a fiduciary duty or of a duty of utmost good faith. *See Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex. 1984). These duties impose higher standards on the executive than the duty of reasonable care associated with negligence law. As discussed below, Mafrige has brought a claim for breach of a fiduciary duty or duty of utmost good faith. Accordingly, the Court **GRANTS** the Government's motion to dismiss Mafrige's claim for negligent leasing.

## D. Breach of Fiduciary Duty or Duty of Utmost Good Faith.

█ The Government moves to dismiss Mafrige's claim for breach of a fiduciary duty or a duty of utmost good faith on two grounds: (1) that the claim sounds in contract, not in tort, and must be filed in the Court of Claims; and that (2) the Bureau of Reclamation employees who drafted and approved the land purchase contract and deed lacked the statutory authority to bind the United States into a "special relationship" with Mafrige.

Texas courts have long held that the executive interest owner owes the nonparticipating royalty interest owners a duty of "utmost good faith" when leasing the mineral fee. *See* Ernest Smith, *Implications of a Fiduciary Standard of Conduct for the Holder of the Executive Right*, 64 Tex.L.Rev. 371 (1985). It was not until *Manges v. Guerra*, 673 S.W.2d at 183, that the Texas Supreme Court equated this duty with a fiduciary obligation. There Manges owned a one-half mineral interest in the Guerra ranch plus the executive interest to the other half interest. The Court held that, under the circumstances, Manges owed the Guerras a fiduciary duty, which he breached by leasing the entire fee to himself for a nominal bonus and by otherwise "dealing with the entire mineral interest so that he received benefits the non-executives did not receive." *Id.* at 184.

In the wake of *Manges,* the lower Texas courts have also found a fiduciary obligation whenever the amounts due on the nonparticipating royalty interests are linked to the royalty negotiated by the holder of the executive interest. This is true in cases, such as this one, where the nonparticipating royalty interests are not fixed by deed (*e.g.*, ⅛th royalty or ¼th royalty). *See Dearing, Inc. v. Spiller,* 824 S.W.2d 728, 732–33 (Tex.App.—Fort Worth 1992, writ denied); *Mims v. Beall,* 810 S.W.2d 876, 879 (Tex.App.—Texarkana 1991, no writ); *Comanche Land & Cattle Co., Inc. v. Adams,* 688 S.W.2d 914 (Tex.App.—Eastland 1985, no writ). Because this duty "arises from the relationship of the parties and not from the express or implied terms of the deed," *Comanche Land & Cattle Co., Inc. v. Adams,* 688 S.W.2d 914, 915–16 (Tex.App.—Eastland 1985, no writ) (quoting *Manges,* 673 S.W.2d at 183), a breach sounds in tort and is properly before this Court under the FTCA.

The Government nevertheless contends that it cannot be liable for breach of a fiduciary duty or duty of utmost good faith because the Bureau of Reclamation officers that drafted and approved the deed lacked the authority to enter the United States into such a "special relationship." In fact, the Government continues, an agreement by which the Government leases a mineral fee for the benefit of a private party violates the Mineral Leasing Act for Acquired Lands, which prohibits the Secretary of the Interior from leasing minerals owned by third-parties, 30 U.S.C. § 355, and requires that all royalties and other payments derived from leases under the Act be paid into the U.S. Treasury.

This argument is unpersuasive. The Mafrige property was purchased under the Reclamation Act, 43 U.S.C. § 371 *et seq.*, which affords the Secretary of the Interior considerable discretion in acquiring real estate for federal reclamation projects.

> Where, in carrying out the provisions of this Act it becomes *necessary to acquire any rights or property,* the Secretary of the Interior is authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose.

43 U.S.C. § 421 (emphasis added). Because there can be no doubt that this section gives the Secretary the authority to purchase an executive interest, *i.e.,* the right to lease the mineral fee, or any other right needed to complete a reclamation project, it must also be deemed to give the Secretary authority to assume any duties that correspond to the right acquired. In this case, the executive right carries with it the concomitant duty to lease the mineral fee for the benefit of non-participating royalty interest owners.

The Government essentially maintains—without citing any persuasive authority—that the Secretary cannot acquire for a reclama-

tion project any right that carries with it a corresponding duty. Under this view, the Secretary could be forced to purchase complete ownership in property when lesser interests would suffice to carry out the reclamation project. For example, in this case, if the reclamation project required only the acquisition of the surface and the right to control oil and gas exploration activities, it would not serve the public interest to force the BOR to purchase the entire mineral fee, possibly at a much higher cost, just to avoid the duty of utmost good faith to the royalty owner. The Government's motion to dismiss Mafrige's claim for breach of a fiduciary duty/duty of utmost good faith is **DENIED.** This ruling does not address the issue of whether this particular tort falls within the discretionary function exception to the FTCA. See 28 U.S.C. § 2680. Frankly, the Court considers the parties' briefing on this issue to be woefully inadequate. That issue shall remain for further consideration.

### III. Plaintiff Mafrige's Motion for Defendant Dreyfus to Pay Royalties into Court's Registry.

Mafrige moves to have Dreyfus pay royalties to the Court's registry. Specifically Mafrige asks that Dreyfus deposit the following:

1. The entire amount heretofore placed in suspense by DeKalb and Dreyfus on account of the matters in controversy in this suit (On January 29, 1992, DeKalb Energy of Texas, Dreyfus' predecessor-in-interest, suspended royalty payments to Mafrige pending the outcome of this case); and

2. A monthly sum equivalent to the ⅛ royalty payable by the lessee under the terms of the oil and gas lease covering the land in controversy herein, *less* the amount payable to the owners of the outstanding non-participating royalty interest of ½₂ of all oil, gas and other minerals produced from said land, reserved by Mary, Adele and Brookes Henderson in that certain warranty Deed to Carl Poenisch dated October 10, 1941, recorded in Volume 30, page 368 of the Deed Records of McMullen County, Texas.

Dreyfus agrees to this motion, and the Government does not object. Therefore, the Court **GRANTS** Mafrige's motion and directs Dreyfus to pay the amounts described above to the Clerk of this Court for deposit into the Registry.

### Conclusion

1. The United States' motion to dismiss Louis Dreyfus Natural Gas Corp.'s cross-complaint is **DENIED.**

2. The United States motion to dismiss Carolyn H. Mafrige's amended complaint is **GRANTED** as to Mafrige's reformation and negligence claims, but is **DENIED** as to Mafrige's quiet title and breach of fiduciary duty/duty of utmost good faith claims.

3. Carolyn H. Mafrige's motion for partial summary judgment on her reformation claim is **DENIED** as moot.

4. Carolyn H. Mafrige's motion to have royalties deposited into the registry of the Court is **GRANTED.**

5. The case will proceed to trial on Dreyfus' and Mafrige's quiet title claims and Mafrige's claim for breach of the duty of utmost good faith. The parties are **ORDERED** to confer immediately to discuss what must be done to have these issues ready for trial and when those matters can be concluded. They are further **ORDERED** to file a joint status report no later than July 12, 1995, advising of the results of their conference. The Court will then set this case for trial.