MONTARA WATER AND SANITARY
DISTRICT, Plaintiff,

v.

COUNTY OF SAN MATEO, a political
subdivision of the State of
California, Defendant.

The United States of America,
Intervenor.

Case No. C 08–2814 JF (RS).

United States District Court,
N.D. California,
San Jose Division.

Feb. 26, 2009.

Christine Carin Fitzgerald, Herman H. Fitzgerald, Law Offices of Herman H. Fitzgerald, a Professional Corporation, Burlingame, CA, David E. Schricker, Law Offices of David E. Schricker, Cupertino, CA, for Plaintiff.

Thomas F. Casey, III, David A. Levy, Glenn Michael Levy, San Mateo County,

County Counsel, Redwood City, CA, for Defendant.

Charles Michael O'Connor, United States Attorney's Office, Northern District of California, San Francisco, CA, for Intervenor.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

JEREMY FOGEL, District Judge.

This action arises from a dispute over the ownership of three water wells located on the property of the Half Moon Bay Airport, a public facility owned since 1948 by the County of San Mateo, California ("the County"). Plaintiff Montara Water and Sanitary District ("Montara") seeks to take the wells by eminent domain. The United States, acting through the Federal Aviation Administration ("the FAA"), has intervened to oppose Montara's efforts. Each party has filed a motion for summary judgment asserting ownership of the wells. The United States claims to have retaken the wells pursuant to a reversion clause contained in the deed by which the airport passed from the federal government to the County in 1948. The United States argues that the reversion was justified by Montara's success in obtaining an interlocutory state-court order authorizing the proposed condemnation and granting Montara current possessory rights over the wells. Montara disputes the existence of any condition justifying the reversion and asks this Court to uphold the state court's order. The County argues that Montara's complaint in eminent domain is preempted in the first instance by the original deed of transfer, federal statutes, FAA regulations, and other evidence of congressional intent to preclude dispositions of airport property that the federal government opposes.

The Court concludes that Montara's successful condemnation of the wells clearly would trigger the reversion clause contained in the airport deed. While Montara has not yet reduced the state court's order to a final judgment permanently divesting the County of its title to the wells, the Court holds that the order effected a transfer of rights sufficient to justify the United States's exercise of its reversionary interest. Because the United States properly exercised its reversionary interest, it now owns the wells. In the interest of completeness, the Court also addresses whether the proposed condemnation is preempted by federal law. In so doing, the Court concludes that even if the reversion clause could not have been triggered until Montara obtained a final judgment and formally divested the County of title, Montara's complaint in eminent domain would be preempted, leaving the County with possession of the wells.[1]

## I. BACKGROUND

The Half Moon Bay Airport was constructed in 1942 for the United States Army, which relinquished the property to the Navy at the end of World War II. The County acquired the airport from the United States, acting through the War Assets Administration and pursuant to the Surplus Property Act of 1944, as amended, by way of a deed dated September 26, 1947 and recorded on May 25, 1948. The airport provides a variety of law enforcement, medical emergency, and sea-rescue services, and is capable of supporting emergency response operations in the event of a disaster preventing road travel. The airport also contains the three water wells

---

1. The County has filed a notice of non-opposition to the United States's motion, noting that whether the Court grants the United States's or the County's motion, "the result is the same." County's Statement of Non–Opposition to United States's Mot. for Summary Judgment, at 1.

that are the subject of the instant dispute. The wells are situated near the airport's eastern boundary; two of the well sites are in close proximity to aircraft parking areas, and one is within the airport's secured area.

Montara, which provides water and sanitary services to the unincorporated coastal communities of Montara and Moss Beach, obtains water from one surface source and several wells, including those located on the airport property. Water has been extracted from the airport wells since approximately 1948. Montara derives its extraction rights from a Revocable Encroachment Permit issued to its predecessor-in-interest in 2004. It pays a volume-based extraction fee which in recent years has yielded an annual payment of approximately $60,000. The fees are deposited in the airport's Enterprise Fund, which supports the facility's largely self-funded operation and maintenance.

Before instituting this action, Montara offered to purchase the airport wells from the County for approximately $5,000. The County refused, and on April 19, 2007, Montara's board adopted a resolution authorizing eminent domain proceedings to obtain title to the property comprising the wells. On May 17, 2007, Montara filed a complaint in eminent domain in the San Mateo Superior Court. The action was transferred to the Santa Clara Superior Court on June 12, 2007, and removed to this Court on June 15, 2007 pursuant to the Quiet Title Act, 28 U.S.C. § 2409a. On October 9, 2007, this Court granted Montara's motion to remand on the ground that the absence of the United States from the action deprived the Court of jurisdiction under the Quiet Title Act.

In November 2007, Montara filed a motion pursuant to § 1255.410 of the California Code of Civil Procedure for an order granting it early possession of the airport wells. On December 19, 2007, the Santa Clara Superior Court granted the motion and issued an Order of Possession giving Montara the right to possess and ultimately condemn the wells. The court established the probable amount of compensation as approximately $6,000. On December 21, 2007, the FAA, which consistently had opposed the condemnation, issued a notice of its intent to revert the airport wells pursuant to the 1947 deed of transfer. The FAA executed and recorded the Notice of Reverter on March 21, 2008. On June 4, 2008, the Superior Court granted the United States's motion to intervene, and on June 5, 2008, the United States removed the action to this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2409a (Quiet Title Act). Because the United States now was present in the action and expressly claimed title to the wells, the Court denied Montara's second motion to remand. The parties then filed the instant motions for summary judgment.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there are no genuine and disputed issues of material fact and the moving party is entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288–89 (9th Cir.1987). The Court must view the evidence in the light most favorably to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *Torres v. City of Los Angeles,* 540 F.3d 1031, 1039–40 (9th Cir.2008). The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other proper evidentiary material. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## III. DISCUSSION

A determination that Montara's action is preempted by federal law might appear to resolve the instant dispute, requiring a declaration that the Superior Court issued the Order of Possession without jurisdiction to do so, and that the County therefore retains title to the wells. Such a result is precluded, however, if the United States validly has exercised its reversionary interest, thus irrevocably altering the parties' rights. Accordingly, the Court's first task is to determine whether Montara's actions triggered the reversion clause contained in the airport deed. Because the United States challenges this Court's jurisdiction to address this issue, the Court begins by confirming its jurisdiction.

### A. Reversion under the 1947 airport deed

#### 1. Subject-matter jurisdiction

 The Quiet Title Act provides the exclusive means by which a party may challenge federal ownership of property.

*Block v. North Dakota,* 461 U.S. 273, 286, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) ("Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property."). The United States argues that its re-acquisition of the wells by reversion prevents Montara from seeking title to the property without properly invoking the Quiet Title Act.[2] Montara contends that the dispositive question is whether there has been a "breach" triggering the reversion clause, and submits that this question may be decided as a preliminary jurisdictional matter since a finding of no breach would eliminate the United States's claim to any property interest justifying its presence in the action. While Montara is correct that the ultimate question is whether the United States or some other party *owns* the wells, there is no question that the United States *claims* to own them. Because Montara also seeks a determination that it owns the wells, the instant case falls squarely within the exclusive grant of jurisdiction provided by the Quiet Title Act.[3]

2. The United States also argues that the Court should not entertain Montara's claims as a quiet title action because Montara has failed to plead a claim under the Quiet Title Act. The Court need not decide whether the United States's purported reversion of the wells, intervention, and removal of this action pursuant to the Quiet Title Act obligated Montara to plead facts giving rise to Quiet Title Act jurisdiction. As explained below, the requirements for jurisdiction under the Act clearly are satisfied in this case. Thus, even assuming the existence of a pleading defect, Montara easily could cure it by amendment. In light of the instant disposition, the Court declines to order such a pointless exercise.

3. The United States argues that *its* motion may be decided without recourse to the Quiet Title Act. Relying on a title report that reflects its purported re-acquisition of the airport wells by reversion, the United States contends that the only question raised by this lawsuit is whether a state-favored entity may condemn federal property—which under settled principles of constitutional law it may not. *See, e.g., Armstrong v. United States,* 364 U.S. 40, 43, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (reaffirming that property owned by the United States "cannot be seized by authority of another sovereign against the consent of the Government"). This argument—and indeed, the United States's entire opening brief in support of its motion for summary judgment—rests on the erroneous contention that title reports adjudicate ownership of real property. Title reports and the recording system serve no such function; they are designed merely to alert those with an interest in property to the possibility of rival interests. Indeed, a county recorder is required by statute promptly to record any title documents that are submitted. *See* Cal. Gov.Code § 27320. The United States's mere recordation of its Notice of Reverter thus does not prove that a breach of the airport deed restrictions actually occurred. Rather, this is a factual issue that the Court must reach before confirming

■ The Quiet Title Act provides for a limited waiver of federal sovereign immunity. *See Gardner v. Stager,* 103 F.3d 886, 888 (9th Cir.1996). The Ninth Circuit has held that "two conditions must exist before a district court can exercise jurisdiction over an action under the Quiet Title Act: 1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property between interests of the plaintiff and the United States." *Leisnoi, Inc. v. United States,* 267 F.3d 1019, 1023 (9th Cir. 2001). Under the first requirement, the United States need only *claim some interest* in the subject property. *See id.* Under the second requirement, the plaintiff must "claim a property interest to which title may be quieted." *Friends of Panamint Valley v. Kempthorne,* 499 F.Supp.2d 1165, 1174 (E.D.Cal.2007) (quoting *Long v. Area Manager, Bureau of Reclamation,* 236 F.3d 910, 915 (8th Cir.2001)).

■ In the instant case, there is no dispute that the United States's claim of title to the airport wells satisfies the first jurisdictional requirement. With respect to the second requirement, while the state court's Order of Possession authorizes Montara to enter upon, possess, alter, and ultimately condemn the airport wells, the Untied States argues that Montara lacks the requisite interest in the wells because the order does not give rise to a present claim to *title.* This argument fundamentally misconstrues the requirements of the Quiet Title Act and interpretive case law. Consistent with the Act's reference to a putative claimant's *"right, title, or interest"* in property as the appropriate jurisdictional test, *see* 28 U.S.C. § 2409a(c), courts have held that a claimant is required to assert only "some interest in the title to the property." *Kansas v. United States,* 249 F.3d 1213, 1224 (10th Cir.2001) (emphasis removed). This requirement serves to limit quiet title actions to those "disputes pertaining to the United States' *ownership of real property." Id.* (emphasis added). The requirement thus reflects certain well-founded jurisdictional constraints, for example, that members of the public may not assert an "interest in title" to public roads in order to pursue essentially regulatory objectives, *see Sw. Four Wheel Drive Assn. v. Bureau of Land Mgmt.,* 363 F.3d 1069, 1071 (10th Cir. 2004),[4] or that disputes concerning the status or boundaries of land are not "title" disputes, *see Kansas v. United States,* 249 F.3d at 1225. It plainly does not mean that the plaintiff must have a present claim to title. Indeed, it is well-settled that a party's inability to claim "complete ownership . . . is inconsequential under § 2409a." *Mafrige v. United States,* 893 F.Supp. 691, 698 (S.D.Tex.1995). A mere equitable interest, such as that created by an easement of necessity, may suffice. *See Werner v. United States,* 9 F.3d 1514, 1516–18 (11th Cir.1993).

the United States's claim of ownership. *See Guttman v. Howard Homes, Inc.,* 241 Cal. App.2d 616, 619, 50 Cal.Rptr. 769 (1966) ("It is well settled that a reversion of title for breach of a condition subsequent will not be decreed except upon clear and satisfactory evidence of a violation of the condition.") (quoting *City of Palos Verdes Estates v. Willett,* 75 Cal.App.2d 394, 405, 171 P.2d 26 (1946)).

4. The Ninth Circuit has not addressed directly the question of whether the Quiet Title Act permits claims based on a public right or interest. *See, e.g., Shultz v. Dep't of Army,* 886 F.2d 1157, 1160 (9th Cir.1989) (considering statute of limitations under Quiet Title Act in claim of access to public road); *see also Friends of Panamint Valley,* 499 F.Supp.2d at 1177 (following Tenth Circuit case law in rejecting claim of public right-of-way over federally owned roadway as insufficient interest for purposes of Quiet Title Act).

 Montara derives its "interest in title" to the airport wells from the Order of Possession. Orders of early possession represent a partial exception to the ordinary rule that a public agency "does not take possession and title [to condemned property] until after judgment and full payment has been made." *Escondido Union Sch. Dist. v. Casa Sueños De Oro, Inc.*, 129 Cal.App.4th 944, 960, 29 Cal.Rptr.3d 89 (2005). The early possession procedures "give effect to the fact that … a landowner in California is permanently deprived of all of his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use." *Escondido Union School Dist.*, 129 Cal.App.4th at 960, 29 Cal.Rptr.3d 89 (citing *Redevelopment Agency v. Gilmore*, 38 Cal.3d 790, 800–801, 214 Cal.Rptr. 904, 700 P.2d 794 (1985)).

 Because orders of early possession formerly could be granted on an ex parte basis, the deprivation of property rights was subject to "defenses to the exercise of eminent domain" that might be raised in later proceedings. *Id.* In 2006, however, the California legislature largely eliminated the ex parte procedure in favor of an exacting process requiring a noticed motion. *See* Cal.Code Civ. Proc. § 1255.410 (2006). Simultaneously, the legislature repealed certain provisions that afforded relief from the enforcement of orders of possession. *See id.* §§ 1255.420, 1255.430. With these changes, the legislature appears to have intended that any defenses to an eminent domain action be raised through the noticed motion required by revised § 1255.410. *See* NORMAN E. MATTEONI & HENRY VEIT, CONDEMNATION PRACTICE IN CALIFORNIA § 8.32 (3d ed. Supp.2007). While the legislature did not repeal § 1255.440, which allows a court to vacate an order of possession where it determines subsequently that the requirements of § 1255.410 have not been satisfied, this provision now appears to be relevant only in the limited context of emergency utility service, where orders of possession still may be issued on an ex parte basis. *See* MATTEONI & VEIT, *supra*, § 8.32.

The Order of Possession issued to Montara was subject to the full rigors of revised § 1255.410, meaning that it effectively "deprived [the County] of all of [its] rights in [the] property." *Escondido Union School Dist.*, 129 Cal.App.4th at 960, 29 Cal.Rptr.3d 89. As such, the order itself provides Montara with a "property interest to which title may be quieted." *Friends of Panamint Valley*, 499 F.Supp.2d at 1174.[5] The passage of actual title is irrelevant to the question of whether a party that has obtained such an order possesses the requisite property interest for purposes of the Quiet Title Act. Of course, when a party bearing such an order takes actions demonstrating its physical possession of the property, *title* itself will be deemed to have passed. *See People v. Joerger*, 12 Cal.App.2d 665, 671, 55 P.2d 1269 (1936) ("Where there has been a prior physical 'taking,' the subsequent divestiture of title is merely a confirmation of the original 'taking.'"); *see also People ex rel. Dep't of Public Works v. Peninsula Title Guaranty Co.*, 47 Cal.2d 29, 32–33, 301 P.2d 1 (1956). This Court, however, need not decide whether Montara's actions resulted in an early divestiture of title—

---

5. Even the title report that purportedly demonstrates the United States's exclusive ownership of the airport wells identifies several "matters affecting title to the [United States's] estate or interest in the land," including the fact that Montara is a "current interest holder[] claiming some right, title[,] or interest" in the property. Half Moon Bay Airport Title Report, Herson–Jones Decl., Ex. 5, at 1, 7.

indeed, the doctrine of early divestiture need not be invoked at all. The Order of Possession provides Montara with a property interest that is more than sufficient to satisfy the Quiet Title Act's jurisdictional requirements. Accordingly, the Court turns to the merits.

### 2. Construction of federal land grants

 It is well-settled that "the construction of a deed to which the United States is a party is a question of federal law." *Mafrige v. United States,* 893 F.Supp. 691, 698 (S.D.Tex.1995); *see also S. Utah Wilderness Alliance v. Bureau of Land Mgmt. (SUWA),* 425 F.3d 735, 762 (10th Cir.2005) ("The construction of grants by the United States is a federal not a state question." (quoting *United States v. Oregon,* 295 U.S. 1, 27–28, 55 S.Ct. 610, 79 L.Ed. 1267 (1935))). While state law occasionally may "furnish[ ] an appropriate and convenient measure of the content of ... federal law," *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 672 n. 19, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (quotation marks and citation omitted), "[i]n the specific context of federal land grant statutes, ... courts may incorporate state law 'only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction,'" *SUWA,* 425 F.3d at 762–63 (quoting *Oregon,* 295 U.S. at 28, 55 S.Ct. 610). In addition, any such "borrowed" state law "must be in service of 'federal policy or functions,' and cannot derogate from the evident purposes of the federal statute." *Id.* (citing *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 672, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979)). With these principles in mind, the Court examines the 1947 airport deed.

### 3. Deed language

The deed conveying the airport property to the County contains the following relevant provisions: First, the County, "for itself, its successors and assigns," agrees to abide by certain restrictions imposed by the Surplus Property Act of 1944 that run with the land. The first of two relevant restrictions provides that

> all of the property transferred hereby ... *shall be used for public airport purposes, and only for such purposes ....* As used herein, "public airport purposes" shall be deemed to exclude use of the structures conveyed hereby, or any portion thereof, for manufacturing or industrial purposes. However, until in the opinion of [the] Civil Aeronautics Administration or its successor Government agency, it is needed for public airport purposes, any particular structure transferred hereby may be utilized for non-manufacturing or non-industrial purposes in such manner as the [County] deems advisable, provided that such use does not interfere with operation of the remainder of the airport as a public airport.

Airport Deed, Herson–Jones Decl., Ex. 1, at 4:27–5:9 (emphasis added). The second restriction provides that

> the property transferred hereby *may be successively transferred only with the approval of the Civil Aeronautics Administration or the successor Government agency* and with the proviso that any such subsequent transferee assumes all the obligations imposed upon the [County] by the provisions of this instrument.

*Id.* at 7:12–16 (emphasis added). Finally, to ensure enforcement of the foregoing provisions, the deed states that

> *upon a breach of any of the aforesaid reservations or restrictions by the [County] ..., whether caused by the*

*legal inability of [the County] to perform any of the obligations herein set out . . . or otherwise, the title, right of possession[,] and all other rights transferred to the [County], or any portion thereof, shall at the option of the [United States] revert to the [United States] upon demand made in writing by the War Assets Administration or its successor Government agency at least sixty (60) days prior to the date fixed for the reverting of such title. . . .*

*Id.* at 7:19–29 (emphasis added).

### 4. Interpretation of the airport deed

It is clear that the grant language requires the occurrence of a "breach of the . . . reservations or restrictions by the [County]" before the United States may exercise its reversionary interest. The United States argues that Montara's condemnation proceeding constitutes such a breach because the transfer has not been authorized by the federal government— indeed the FAA, which succeeded to the reversionary interest, vigorously opposes Montara's efforts and expressly has withheld approval of any transfer. *See, e.g.,* Letter dated April 19, 2007 from FAA to Half Moon Bay Airport Manager, Larson Decl. ¶ 11 & Ex. A at 1, 2 ("The Federal Aviation Administration (FAA) is the successor federal agency responsible for the federal oversight of the lands conveyed under the War Assets Administration (WAA) deed dated September 26, 1947[and] . . . . is not in favor of a sale of the property for the well sites."); Email dated March 21, 2008 from FAA to San Mateo Director of Public Works, Levy Decl. Ex. H at 1, 3–4 (explaining that the agency considered Montara's decision to proceed without federal approval a breach of the deed restrictions, and disclosing the agency's intent to revert the airport wells). Undoubtedly, the County's voluntary alienation of airport property without the FAA's approval would place it in breach of

the deed restrictions. The only question is whether legal actions taken by Montara can be said to place the County in breach. Montara observes that the deed is silent as to the effect of an involuntary transfer by eminent domain, and contends that the deed is no more than a contract between the federal government and the County restricting the latter's ability voluntarily to transfer the property.

Where a covenant deems a property owner to have "breached" when the owner transfers or makes improper use of the property, common sense suggests that the owner's involuntary subjection to eminent domain proceedings will not qualify as a breach. Montara offers several cases supporting this inference. In *Romero v. Department of Public Works,* 17 Cal.2d 189, 109 P.2d 662 (1941), for example, the court faced a reversionary interest triggered by the property owner's failure to use the property "for railroad purposes." *Id.* at 194, 109 P.2d 662. The court noted that when the property was condemned, "the condition that it should be used for railroad purposes became impossible of further performance by operation of law." *Id.* For this reason, the court held that "the owner of the possibility of a reverter prior to a breach of the condition is not entitled to compensation when the property is taken under the law of eminent domain." *Id.*

Similarly, in *United States v. 263.5 Acres of Land,* 54 F.Supp. 692, 693 (N.D.Cal.1944), the court confronted a grant restriction on the "sale or mortgage" of a property by Marin County, California. The question was whether the United States's condemnation of the property violated the restriction, subjecting the property to forfeiture. The court reasoned that while condemnation "undoubtedly is a 'sale' in a certain sense[,] in that it is a compulsory parting with property whereby

the condemnor stands towards the owner as buyer towards seller," the grant plainly referred to a "sale" in the ordinary sense of a voluntary act, and thus did not apply to condemnation. *Id.* Finally, the court in *State v. Federal Square*, 89 N.H. 538, 3 A.2d 109 (1938), discussed the distinction between voluntary and involuntary actions with respect to a use-based grant restriction on property owned by a city. The court noted that although "[t]he city no longer has the use of the property, . . . this is because of the exercise of [a] superior authority to which it has been obliged to submit. The State has taken the property by eminent domain, and *it is not suggested that the city has acted in any way to aid in bringing about the acquisition by the State.* Thus the city *has committed no breach* of the conditions, and the reverting clause therefore becomes inapplicable in determination of the controversy." *Id.* at 113 (emphasis added).[6]

■ In contrast to the "use"—or "sale"—based restrictions at issue in the foregoing cases, the airport deed's use of the word "transfer" does potentially broaden the scope of the grant restriction and weaken the inference that a disposition must be voluntary to constitute a breach. Yet the logic of each case at least suggests that a condemnation proceeding will not trigger a reversionary interest based on the owner's "breach" because the owner has taken no action to violate the relevant restriction. In addition, as Montara notes, reversion clauses generally are disfavored and therefore are interpreted strictly to prevent their exercise. *See, e.g., Springmeyer v. City of S. Lake Tahoe*, 132 Cal. App.3d 375, 380–82, 183 Cal.Rptr. 43 (1982).

■ Nonetheless, several countervailing factors compel a different interpretation in the instant case. First, the airport deed explicitly broadens the definition of "breach" to include not only conditions of the County's own making, but those *"caused by the legal inability of [the County]."* Airport Deed, at 7:19–29 (emphasis added). This language indicates that the County may "breach" the deed restrictions where it becomes legally unable to prevent their violation, as upon "the exercise of [a] superior authority to which [the County] has been obliged to submit." *Cf. Federal Square*, 3 A.2d at 113. The "legal inability" clause alone suggests that an involuntary sale or transfer may justify reversion.

Second, to the extent that Montara's state-law authorities would produce a result hostile to federal interests, the Court must eschew state law in favor of federal law.[7] In the instant case, the relevant federal law consists of the Surplus Proper-

---

6. *Campbell v. Alger*, 71 Cal.App.4th 200, 83 Cal.Rptr.2d 696 (1999), which held that an involuntary condemnation did not trigger a right of first refusal, is inapposite in that the contract at issue specified that the right "would arise only '[i]n the event . . . [the Algers] . . . determine[] to sell [their] . . . interest . . . to a third party after having received a bona fide and written offer for such purchase, or make [] a bona fide and written offer to sell [their] . . . interest to a third party. . . .' " *Id.* at 207, 83 Cal.Rptr.2d 696 (amendments in original). The instrument itself therefore resolved the issue of whether an involuntary disposition could trigger the right in question.

7. Acknowledging the potential applicability of federal law, Montara relies heavily on *263.5 Acres of Land,* a federal case. However, even if it is viewed as supportive of Montara's position, *263.5 Acres* rested entirely on state-law decisions, including *Federal Square. See 263.5 Acres of Land,* 54 F.Supp. at 693–94 (citing exclusively to *In re Wilkey's Estate,* 337 Pa. 129, 10 A.2d 425 (1940), *In re Board of Supervisors of Chenango County,* 6 N.Y.S.2d 732 (N.Y.Co.Ct.1938), and *State v. Federal Square Corporation,* 89 N.H. 538, 3 A.2d 109 (1938)).

ty Act of 1944 and its 1947 amendments, which imposed the applicable deed terms, and the well-established canon that federal land grants are to be construed in favor of the government, with any doubts resolved in the government's favor. *See United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 115–16, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957) (interpreting land grant to railroad consistent with congressional intent and holding that all doubts must be resolved in the government's favor); *see also Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 47–60, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) (holding that interpretation of terms in federal land grant is controlled by purposes of federal authorizing statute, and resolving doubt in government's favor); *United States v. Union Oil Co. of Cal.*, 549 F.2d 1271, 1273 n. 5 (9th Cir.1977) ("To the extent that the argument rests on the meaning of the word itself, ... the government is entitled to have the ambiguity resolved in its favor under [*Union Pacific* ]."); *Occidental Geothermal, Inc. v. Simmons*, 543 F.Supp. 870, 877 (N.D.Cal. 1982) (interpreting federal land grant in light of authorizing statute's purposes, and applying *Union Pacific* canon to resolve any remaining doubt).

The Surplus Property Act of 1944, as amended in 1947, not only authorized but prescribed the terms of the deed by which the federal government transferred the airport to the County. *See* Airport Deed at 1:4–8 (stating that the transfer was occasioned by the "UNITED STATES OF AMERICA, acting by and through the War Assets Administration, under and pursuant to ... the powers and authority contained in the provisions of the Surplus Property Act of 1944, as amended, and applicable rules, regulations[,] and orders ..."). The 1947 Amendments to the Act established the following two preconditions for transfer of property to a local government for use as a public airport: the transfer had to be "subject to the terms, conditions, reservations, and restrictions" contained in the Act; and the property interest conveyed had to be "essential, suitable, or desirable for the development, improvement, operation, or maintenance of a public airport ... [,] or reasonably necessary to fulfill the immediate and foreseeable future requirements of the grantee for the development, improvement, operation, or maintenance of a public airport, including property needed to develop sources of revenue...." Act of July 30, 1947, Pub.L. No. 80–289, § 13(g)(1), as reprinted in 1947 U.S. Code Congressional Service 673, 673–75 [hereinafter Surplus Property Act Amendments]. Having thus provided that only property suitable for airport use could be granted in the first instance, Congress declared that

> [n]o property disposed of under the authority of this subsection shall be used, leased, sold, salvaged, or disposed of by the grantee or transferee for other than airport purposes without the written consent of the Administrator of Civil Aeronautics, which consent shall be granted only if the Administrator of Civil Aeronautics determines that the property can be used, leased, sold, salvaged, or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which such property is located....

*Id.* § 13(g)(2)(A). To enforce these restrictions, Congress required the inclusion of a reversion clause, providing that "[i]n the event that any of the terms, conditions, reservations, and restrictions upon or subject to which the property disposed of is not met, observed, or complied with, all the property so disposed of or any portion thereof, shall, at the option of the United States, revert to the United States in its then existing condition." *Id.* § 13(g)(2)(H).

The desire of Congress to regulate the successive disposition of airport property stemmed from its acute concern that the transferred airports remain financially self-sustaining. That concern was among the principal reasons for passage of the 1947 amendments to the Surplus Property Act. The Senate Report accompanying the 1947 amendments noted that "[n]one of the[ ] airports can be self-sustaining unless, in addition to [the core aviation facilities whose transfer was permissible under the 1944 Act], they can secure the nonaviation facilities in the vicinity of the airport which may be used for revenue-producing purposes." Government Surplus Airports—Disposition, Senate Committee on Armed Services, S.Rep. No. 359, June 26, 1947, as reprinted in 1947 U.S. Code Congressional Service 1519, 1520. Congress's solution was to authorize the transfer of "property needed to develop sources of revenue." Surplus Property Act Amendments, § 13(g)(1). The strict set of limitations on the use and disposal of such property reveals Congress's expectation that the appropriate federal agency would serve as a final check on actions potentially harmful to the airports, wielding an effective veto power.[8]

The restrictions of the amended 1944 Act now are codified in substantially the same form in 49 U.S.C. §§ 47151–47153, which sets forth the purposes for which federal property may be transferred and the limitations that must accompany any such transfer. Section 47151 provides that federal agencies may transfer surplus federal property to local governments for airport use *only* where the Secretary of Transportation determines that one of the following conditions is present: (1) the property to be transferred is "desirable for developing, improving, operating, or maintaining a public airport"; (2) the transfer is "reasonably necessary to fulfill the immediate and foreseeable future requirements for developing, improving, operating, or maintaining a public airport"; or (3) the transfer is "needed for developing sources of revenue from nonaviation businesses at a public airport." 49 U.S.C. § 47151(a)(1)(A)-(C). Critically, § 47152(1) provides that an airport owner "may ... dispose of the [property] for other than airport purposes only after the Secretary of Transportation gives written consent that the interest can be used, leased, salvaged or disposed of without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which the property is located." *Id.* § 47152(1).

Federal regulations provide further evidence of congressional intent to give the FAA final authority over the use and disposal of property transferred pursuant to the Surplus Property Act. For example, Part 155 of Title 14 of the Code of Federal Regulations, titled "Release of Airport Property from Surplus Property Disposal

---

8. The Department of Transportation ("DOT"), through the FAA, has effectuated these congressional goals by promulgating regulations that condition the receipt of federal funds on compliance with certain fiscal requirements. One such requirement is that "[e]ach federally assisted airport owner/operator ... have an airport fee and rental structure that will make the airport as self-sustaining as possible under the particular airport circumstances, in order to minimize the airport's reliance on Federal funds and local tax revenues." 64 Fed. Reg. 7696, 7710 (Feb. 16, 1999). To this end, FAA

Grant Assurances require that the airport "not take or permit any action which would operate to deprive [the Airport] of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary [of Transportation]." FAA Airport Grant Assurances (3/2005), at 4. An airport therefore may "not sell, lease, encumber, or *otherwise transfer or dispose of* any part of its title or other interests in the property [referenced by the] application." *Id.* (emphasis added).

Restrictions," requires submission to the FAA of a formal request for release from any deed restrictions. Specifically, "[a] request for the release of surplus airport property from a term, condition, reservation, or restriction in an instrument of disposal ... must be in writing and signed by an authorized official of the public agency that owns the airport." 14 C.F.R. § 155.11(a). "Each request for a release must include ... [t]he purpose for which the property was transferred, such as for use as a part of, or in connection with, operating the airport or for producing revenues from nonaviation business," as well as "[a] statement of the circumstances justifying the release on the basis" either that the property "no longer serves the purpose for which it was made subject to the terms, conditions, reservations, or restrictions concerned," or that the requested release from those conditions "will not prevent accomplishing the purpose for which the property was made subject to [those conditions]...." 14 C.F.R. § 155.11(c)(4), (c)(7); 14 C.F.R. § 155.3(a)(1)-(2) (emphasis added).

The foregoing provisions evince a clear legislative intent to prohibit any "transfer" of airport lands absent the FAA's determination that such transfer will compromise neither the airport's current operations nor its future ability to sustain itself. The provisions confirm that the airport deed restrictions at issue in the instant case encompass involuntary transfers of airport property. This reading is supported by the Ninth Circuit's holding in *Public Utility District No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc.,* 618 F.2d 601, 602 (9th Cir.1980), where the court addressed whether a state-favored entity could condemn electric facilities financed by the federal government pursuant to the Rural Electrification Act ("REA"). Section 907 of the REA provides that

*[n]o borrower of funds under [the Act] shall, without the approval of the Administrator, sell or dispose of its property ... acquired under the provisions of this chapter, until any loan obtained from the Rural Electrification Administration, including all interest and charges, shall have been repaid.*

7 U.S.C. § 907 (emphasis added). While § 907 is silent as to the REA's authority to block an involuntary "s[ale] or disposal of ... property" effected by eminent domain, the Ninth Circuit construed § 907 as conditioning *any* "transfers" upon REA approval—including those accomplished by eminent domain. *Big Bend,* 618 F.2d at 602. The Surplus Property Act contains nearly identical provisions, declaring that

*[n]o [airport] property ... shall be ... disposed of by the grantee or transferee for other than airport purposes without the written consent of the Administrator of Civil Aeronautics, which consent shall be granted only if the Administrator of Civil Aeronautics determines that the property can be used, leased, sold, salvaged, or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which such property is located....*

Surplus Property Act Amendments, § 13(g)(2)(A); *see also* 49 U.S.C. § 47152(1) (codifying § 13(g)(2)(A) of the Surplus Property Act, as amended). There is a compelling argument that under *Big Bend,* the Surplus Property Act vests the FAA with authority to *block* a proposed condemnation of airport property in the first instance, without recourse to the reversionary interest. Without deciding whether the Surplus Property Act by its terms confers authority upon the FAA to withhold approval of an involuntary disposition, *Big Bend* at a minimum supports the conclusion that the "transfer" restrictions in the airport deed must be read to

include involuntary dispositions for purposes of the reversion clause.

■ Even if there remained some doubt as to the proper construction of the airport deed, "[i]t has long been established that, when grants to federal land are at issue, any doubts 'are resolved for the Government, not against it.'" *Andrus v. Charlestone Stone Products Co., Inc.,* 436 U.S. 604, 617, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (quoting *Union Pacific,* 353 U.S. at 116, 77 S.Ct. 685).[9] Here, the airport deed explicitly broadens the term "breach" to encompass situations in which the County's "legal inability" prevents compliance with the deed's transfer restrictions, and the relevant body of federal law requires expressly that the FAA be permitted to exercise its reversionary interest in response to unauthorized condemnations of airport land. "*A fortiori,* the Government must prevail in a case such as this, when the relevant statutory provisions, their historical context, [and] consistent administrative ... decisions ... all weigh in its favor." *Andrus,* 436 U.S. at 617, 98 S.Ct. 2002.

### 5. Timing of breach

■ Having determined that an involuntary transfer of airport property without the FAA's approval permits the United States to exercise the reversionary interest contained in the airport deed, the only remaining question in the present case is whether the Order of Possession constituted a transfer of rights sufficient to trigger the interest or, conversely, whether the United States was required to await a final judgment in Montara's favor. The Order of Possession issued by the state court on December 19, 2007 "authorized and em-powered" Montara to "enter upon[,] ... take possession [of][,] and use the subject property ... [,][and] to remove therefrom any and all persons, obstacles, improvements or structures of every kind or nature thereon situated." Order of Possession, Fitzgerald Decl., Ex. E, at 2:20–25. Over the FAA's strenuous objection to any transfer of airport property, the order caused the County to be "permanently deprived of all of [its] rights" in the airport wells. *Escondido Union School Dist.,* 129 Cal.App.4th at 960, 29 Cal.Rptr.3d 89; *see also supra* Section III.A.1. This transfer of rights was sufficient to justify the United States's exercise of its reversionary interest. Accordingly, the United States was correct to conclude that "San Mateo County continues to be in default of its obligations under the [airport deed] in that the property is subject to a condemnation action and thus ... compliance with covenants of the deed regarding [FAA] approval of any conveyance is ... impossible." Notice of Reverter, Herson–Jones Decl., Ex. 3, at 4.

### B. Federal preemption

While concluding that the reversion of the wells did cause an immediate transfer of ownership, the Court also addresses the County's thoroughly briefed preemption argument, which relies largely upon the same material that supports the Court's interpretation of the airport deed, and which would have dispositive effect were it not for the valid prior exercise by the United States of its reversionary interest. As the Court now explains, Montara's action is and at all times has been preempted by federal law. Thus, even if it were the case that the reversion clause could not have been triggered prior to a final judg-

---

**9.** Even if *Springmeyer,* 132 Cal.App.3d at 380–82, 183 Cal.Rptr. 43, which requires strict construction of reversion clauses, supported Montara's position and engaged *Union Pacific* in a "duel of competing canons," *National* *Rifle Ass'n v. Bentsen,* 999 F.2d 772, 773 (4th Cir.1993), the federal *Union Pacific* canon undoubtedly would prevail under the Supremacy Clause.

ment and divestiture of the County's title, Montara would be unable to obtain the wells by eminent domain.[10]

### 1. General principles and relation to eminent domain

■■■■ Preemption is a question of congressional intent and may be express or implied. *Fidelity Fed. Sav. & Loan Ass'n v. Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Implied preemption occurs when state law or an action authorized by state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 153, 102 S.Ct. 3014 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)), such as by "injur[ing] the objectives of [a] federal program," *Topa Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065, 1071 (9th Cir.2003) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979)), or by "interfer[ing] with the 'methods by which [a] federal statute was designed to reach [its] goal,'" *Ting v. AT & T*, 319 F.3d 1126, 1137 (9th Cir.2003) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)). Federal regulations have the same preemptive force as statutes. *Fidelity*, 458 U.S. at 153–54, 102 S.Ct. 3014.

■■■ While the power of eminent domain is a core attribute of state sovereignty, *State of Georgia v. City of Chattanooga*, 264 U.S. 472, 480, 44 S.Ct. 369, 68 L.Ed. 796 (1924), it is well-settled that a state's power of eminent domain must yield where its exercise would frustrate the purposes of a federal statute. *See, e.g., City of Morgan v. S. La. Elec. Coop. Ass'n*, 31 F.3d 319, 323 (5th Cir.1994), *reh'g and reh'g en banc denied*, 49 F.3d 1074 (5th Cir.1995) (prohibiting exercise of state eminent domain power that would interfere with federal purposes); *see also Fidelity*, 458 U.S. at 153, 102 S.Ct. 3014 (holding that preemption principles "are not inapplicable ... simply because real property law is a matter of special concern to the States"). The Ninth and Fifth Circuits have held consistently that a state entity's eminent domain power is preempted under these circumstances. *See Public Utility District No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc.*, 618 F.2d 601, 603 (9th Cir.1980); *Public Utility Dist. No. 1 of Pend Oreille County v. United States*, 417 F.2d 200, 202 (9th Cir. 1969); *see also City of Morgan*, 31 F.3d at 323; *City of Madison v. Bear Creek Water Ass'n*, 816 F.2d 1057 (1987).

In *Public Utility Dist. No. 1 of Pend Oreille County v. United States*, the Ninth Circuit held that a state-favored entity's attempt to condemn electric facilities receiving federal subsidies pursuant to the Rural Electrification Act was preempted because it would interfere at a broad level with the REA's purpose of promoting rural electrification. 417 F.2d at 202. Reaffirming this rule in *Public Utility District No. 1 of Franklin County v. Big Bend Electric Cooperative, Inc.*, the Ninth Circuit held once again that "under the Supremacy Clause of the Constitution[,] a state municipal public utility [cannot] condemn property owned by a federally subsidized public utility where the condemnation would interfere with [a] federal purpose." 618 F.2d at 603. More recently, the Fifth Circuit twice has applied *Pend Oreille* and *Big Bend*. *See Bear Creek*, 816 F.2d at 1060 (citing *Big Bend*, 618 F.2d 601, in holding that attempted condemnation of water facilities owned by association indebted to federal

---

10. As noted previously, the interests of the County and the United States are aligned to such an extent that the County would consider a judgment in either party's favor to produce the same result. *See supra* note 1.

Farmer's Home Administration was preempted because it would "adverse[ly] effect ... the remaining customers of Bear Creek[,] ... [and] undermine Congress's purpose of facilitating inexpensive water supplies for farmers"); *City of Morgan*, 31 F.3d at 323–24 (citing *Pend Oreille*, 417 F.2d at 201–02, in holding that state entity's attempt to condemn federally subsidized electric facility was preempted by the REA because it "would 'stand as an obstacle' to the repayment of federal loans, to the financial viability of federally financed electricity cooperatives, and ultimately, to the maintenance of electricity service to rural areas").

 In cases where the existence of an "obstacle" for preemption purposes turns on the resolution of disputed facts, a court must defer to the reasoned opinions of the agency responsible for administering the relevant statute. *Big Bend*, 618 F.2d at 603. In *Big Bend*, the Ninth Circuit rejected the prospective condemnor's argument that summary judgment based on *Pend Oreille* was inappropriate in light of factual disputes concerning "the wisdom of the taking." *Id.* The court observed that the agency charged with administering the statute had "determined that the [utility's] proposed condemnation would decrease the ability of the [agency] to serve [the congressional] purpose." *Id.* Because the agency in question was "intended by Con-

gress to determine the appropriate course of conduct to accomplish the legislative purpose," it was to be "give[n] wide latitude ... in [its] area of expertise." *Id.*; *see also City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 256 F.Supp.2d 754, 767 & n. 9 (M.D.Tenn.2003) (noting that the "Ninth and Fifth Circuits correctly give deference to the [agency's] determination in th[e] area of [its] expertise," and declining to apply *Pend Oreille* only because the relevant federal agency had "not actually [appeared in the case] or otherwise taken a stance on the issue of frustration of the" federal statute).

**2. Preemptive effect of the deed, statutes, and regulations**

 As explained earlier, *see supra* Section III.A.4, the text and legislative history of the Surplus Property Act, as well as subsequent congressional enactments and federal regulations, leave no doubt that Congress intended the FAA to exercise permanent authority over any proposed alienation of airport property. Congress provided the FAA with such authority in order to ensure that the airports (1) continue to be self-sustaining, particularly through the use of revenue-generating nonaviation facilities, and (2) remain operationally viable.[11] It required that any transfer of surplus property by a federal agency be preceded by a determina-

---

11. Montara fails even to address the preemptive effect of the Surplus Property Act of 1944, as amended, or subsequent enactments recodifying the Act. Instead, Montara points to a deed from the federal government to Montara's alleged predecessor-in-interest, the Montara Elementary School District ("District"), as evidence of the federal government's intent to permit alienation of the wells. That deed is dated October 15, 1948, several months after the County accepted the primary deed transferring the airport property in fee simple subject only to a reserved access easement for the airport wells. By the second deed, the federal government conveyed the

reserved easement to the District, an act to which Montara now attributes some intent to allow condemnation of the wells. However, when a dispute arose some thirty years later over whether the County or the District's successor-in-interest held the extraction rights to the underlying water, the California Court of Appeal held that the second deed conveyed no more than an access easement to the District, and that the County had exclusive rights to the water. *See County of San Mateo v. Citizens Utilities Company of California,* No. C 40393, at *3–8 (Cal.App. 1st Dist. Mar. 21, 1978). With respect to the federal government's intent as to both transfers, the court

tion that the property was suitable for immediate or future airport use, including for nonaviation, revenue-generating purposes. *See* Surplus Property Act Amendments, § 13(g)(1). Correspondingly, each airport grantee was made subject to conditions governing the use and disposal of the property, including a strict prohibition on the transfer or disposal of any airport property without FAA approval. *Id.* § 13(g)(2)(A). Finally, to enforce these provisions, Congress empowered the federal government to retake the property should it deem any subsequent transfer or disposal of airport property harmful to the airport's short- or long-term interests. *Id.* § 13(g)(2)(H).

It is extremely unlikely that Congress would have established such a firm set of limitations on the use and the disposal of airport property, enabling the FAA to ensure the airports' continued viability over time, only to allow state-favored entities to condemn parts of the granted properties with "no requirement that an underlying federal purpose be considered." *Pend Oreille,* 417 F.2d at 201–02. By the FAA's own reading of the Surplus Property Act, the covenants burdening the deeds of transfer ensure that "every acre of a surplus airport is held in trust for a specific purpose and usage." FAA Order 5190.6A, Airport Compliance Requirements, dated Oct. 2, 1989, ¶ 4–18(b). A state or state-favored entity may not violate that trust consistent with the Supremacy Clause. Montara's successful condemnation of the airport wells would "interfer[e] with the 'methods by which [the Surplus Property Act] ... was designed to reach [its] goal.'" *Ting v. AT & T,* 319 F.3d 1126, 1137 (9th Cir.2003) (quoting *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)). It would undermine the FAA's ability to accomplish its prospective supervisory function with respect to the granted properties, and therefore would stand as an obstacle to implementation of the Act's careful procedural design.[12]

specifically noted that in reserving only an access easement, as opposed to the wells themselves and associated water rights, the government may well have wanted the airport owner "to charge the user of the easement for the water from the wells." *Id.* at 6 n. 4. In fact, as the legislative history of the Surplus Property Act indicates, it is quite likely that this was precisely the United States's intent.

**12.** This conclusion closely parallels that reached by the Fifth Circuit in *City of Morgan.* As already noted, the REA and the Surplus Property Act of 1944, as amended, contain very similar provisions requiring agency approval prior to disposal of land or facilities in which the federal government retains an interest. Both provisions condition approval on the putative transferor's satisfaction of certain terms deemed essential to the integrity of the respective federal programs. Neither provision, however, speaks to the relevant agency's authority over involuntary transfers.

In the panel opinion in *City of Morgan,* the court recognized the position—adopted by the Ninth Circuit in *Big Bend*—that § 907 of the REA gives the implementing agency the authority to block even involuntary transfers. *See supra* Section III.A.4; *see also City of Morgan,* 31 F.3d at 322. The panel nonetheless "elect[ed] to . . . . save for another day the issue of whether 7 U.S.C. § 907 by its terms confers authority on the Administrator to withhold approval of an involuntary disposition." *City of Morgan,* 31 F.3d 319, 322 (5th Cir.1994). Instead, the panel "consider[ed] only whether a conflict exists because the proposed state-law expropriation would frustrate a federal purpose." *Id.*

In a second opinion denying panel rehearing and rehearing *en banc,* the court again "declined to decide whether § 907 should be interpreted broadly enough to allow the REA to prevent a proposed expropriation." 49 F.3d 1074, 1075 (5th Cir.1995). However, the court held that "at the very least, the provision reflects a general federal policy of protecting the integrity of the REA's security interests. *Thus, even a narrow interpretation of § 907 supports the panel's preemption analysis.*" *Id.* In the instant case, the Surplus Property Act's agency approval requirement,

Even if preemption were limited in this case to a finding of conflict between the proposed condemnation and the substantive goals of the Surplus Property Act, deference to the FAA's reasoned position would produce the same result. Montara disputes whether its condemnation of the wells might impede the airport's operations or development, or deprive it of necessary operating funds. Montara contends that prior use of the wells under several revocable encroachment permits demonstrates the absence of a conflict. This contention ignores the impact of the loss of recurrent airport revenue from water sales, the airport's future development needs, and obvious operational differences between permissive use and fee simple ownership of the wells. However, even if a genuine dispute of fact existed, no further evidence would be required to resolve it. The FAA, by its prior statements, intervention in this action, and exercise of its reversionary interest, has demonstrated its strenuous opposition to Montara's efforts and has articulated a coherent set of reasons for that opposition.

Specifically, the FAA has explained that it is

not in favor of a sale of the property for the well sites [because] .... the sale ... would encumber the County's ability to

provide for future aviation development should the demand for leasehold occur in the future. The property in question is suitable for aircraft storage ..., a fixed based operator (FBO) aviation business, or other aviation compatible non-aeronautical business development. Additional airport property would be lost due to the need to install perimeter fencing of the well sites and three separate access right-of-ways [sic] .... [,] [since] [t]he County must restrict access to the airfield to authorized users/tenants of HAF [Half Moon Bay Airport] to remain in compliance with the grant agreement Assurances.

Letter dated April 19, 2007 from FAA to Mark Larson, Half Moon Bay Airport Manager, at 1–2.[13] The FAA accordingly reiterated that it is

not in agreement that the land is no longer needed for an airport purpose. The wells can be capped and relocated to another area. The surface area may be then returned for airport development as identified above. Therefore, the land is not considered surplus property and the FAA San Francisco Airports District Office would not recommend a release of the federal agreement obligations to permit the sale of the

---

which was designed to ensure the continued integrity, viability, and self-sustenance of the transferred airports, similarly confirms that an unauthorized transfer is precluded by the obstacle preemption doctrine. Indeed, the instant case is similar not only to *City of Morgan*, but to *Big Bend*, in which substantially the same considerations supported both a finding of direct federal control and indirect federal authority via obstacle preemption. *See Big Bend*, 618 F.2d at 601–03.

**13.** The FAA, through the declaration of the Half Moon Bay Airport's manager, also has provided evidence of past security incidents caused by Montara's presence on the airport property. *See* Larson Decl., ¶ 5 & Ex. 5 (containing report detailing dangerous airplane

take-off and landing conditions created by agents of Montara within the airport's runway safety area); ¶ 6 & Ex. 6 (providing file memo by airport manager recording unauthorized construction activities by agents of Montara outside the fenced well sites, in violation of Montara's Revocable Encroachment Permit). While the Court sustains Montara's objections to those portions of the Larson Declaration that lack foundation or are hearsay, *see* Larson Decl., ¶¶ 4, 7, & 8, the documented incidents amply support the FAA's views and make the FAA's concerns regarding operational safety and security anything but "hypothetical." *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 130–31, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (finding hypothetical conflict insufficient to warrant preemption).

property.... The FAA has included HAF in the National Plan of Integrated Airport Systems (NPIAS) as a general aviation reliever airport. The airport is a valuable transportation link for interstate and intrastate air transportation.... *We are of the opinion that the federal interest in the land for air transportation purposes continues to be the primary need for the use of the property.*

*Id.* (emphasis added). As the successor to the Civil Aeronautics Administration, the FAA is vested with "the sole responsibility for determining and enforcing compliance with the terms, conditions, reservations, and restrictions upon or subject to which surplus property is disposed of pursuant to" the Surplus Property Act. Surplus Property Act Amendments, § 13(g)(4). The FAA therefore is the agency "intended by Congress to determine the appropriate course of conduct to accomplish the [Act's] legislative purpose," and its reasonable views must prevail. *Big Bend,* 618 F.2d at 603.[14]

## IV. CONCLUSION

The airport deed, by its plain terms, in light of its statutory context, and read in accordance with settled federal rules of construction, permits the United States to retake airport property that is subjected to unauthorized condemnation proceedings. In addition, because Congress sought to provide the FAA with prospective oversight powers in furtherance of specific statutory purposes, Montara's attempt to condemn the wells against the FAA's wishes is hostile to the purposes of the controlling federal statutes. As a result, the condemnation is—and at all times has been—preempted. However, because the FAA properly exercised its reversionary interest when Montara obtained an order of early possession, the United States now owns the wells. Accordingly, the United States's motion for summary judgment will be granted, the County's motion will be denied as moot, and Montara's motion will be denied because federal property may not be taken without the consent of the sovereign.[15]

**IT IS SO ORDERED.**

14. *Big Bend* requires deference to an agency's predominantly factual determinations in its area of expertise. *See* 618 F.2d at 603 (citing § 706 of the Administrative Procedure Act). This standard is distinct from the less deferential treatment given to an agency's legal determinations as to whether a particular state law would "stand as an obstacle" to federal purposes. In *Geier v. American Honda Motor Co.,* 529 U.S. 861, 883–86, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), the Supreme Court discussed the level of deference due to an agency's informal views on the objectives of a regulation it had promulgated and its position that a state lawsuit would "stand as an obstacle" to those objectives. The Court "place[d] some weight" on the agency's primarily legal views-an approach which the Third Circuit analogized to *Skidmore* deference. *See Fellner v. Tri–Union Seafoods, L.L.C.,* 539 F.3d 237, 249–50 (3d Cir.2008) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). *Geier* is inapplicable in the instant case, where the FAA's views pertain solely to whether the proposed condemnation would interfere with certain key aspects of the airport's long-term viability and operational integrity.

15. On November 12, 2008, Montara filed an ex parte motion once again seeking early possession of the wells. In light of the instant disposition, that motion also must be denied.